Caleb E. Mason, Esq. (State Bar No. 246653)
WERKSMAN JACKSON & QUINN, LLP
888 West Sixth Street, Fourth Floor
Los Angeles, California 90017
cmason@werksmanjackson.com
Telephone: (213) 688-0460
Facsimile: (213) 624-1942

Attorney for Plaintiff
Michael Gonzalez

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE

| MICHAEL GONZALEZ, | ) | **Case No.:** |
|---|---|---|
| Plaintiffs, | ) | **COMPLAINT for:** |
| v. | ) | |
| CITY OF PACIFIC GROVE, CALIFORNIA; POLICE CHIEF CATHY MADALONE; CITY MANAGER BEN HARVEY; DOES 1-10, | ) | **1. Retaliation for Exercise of First Amendment Rights, in Violation of 42 U.S.C. § 1983** |
| Defendants. | ) | |

**INTRODUCTION**

1.    Plaintiff Michael Gonzalez ("PLAINTIFF" or "MR. GONZALEZ") was a good cop.

2.    MR. GONZALEZ was fired from his job as a police officer for the City of Pacific Grove, California, for expressing himself as a citizen, in political discussions on matters of public concern, on his own free time, while off-duty, on his own personal social media account.  He was fired because one City Council

member did not like his political views.  That should not happen to anyone in this country.  It is a fundamental principle of American constitutional democracy that we don't fire public employees for their private expression of their political opinions on their own time.  The City of Pacific Grove forgot, or simply doesn't care about, that principle.

3.     MR. GONZALEZ is a second-generation Mexican-American who grew up poor in Bakersfield, California.  He overcame the hardships of his youth and decided to devote himself to a career of service to others.  He signed up for the Kern County Police Academy, graduated, and was hired by Kern County Sheriff's Department, and then by the Pacific Grove Police Department.  He spent four years serving the people of Pacific Grove.  He had a clean disciplinary record, was named Officer of the Year, and earned the Department's Lifesaving Award for diving in the ocean and pulling a drowning kayaker to safety.

4.     This case is not about anything MR. GONZALEZ did as a cop.  There was never any allegation or suggestion that he ever did anything improper on the job.  Instead, he was fired for expressing his political views as a private citizen, while off-duty, on his own time.  While off-duty, on his own time, on his own personal social media account, he posted the phrase "Free Kyle Rittenhouse," and an image that said "Fuck 'Black Lives Matter'."

5.     Many people disagree with those statements. That is their right. Others agree with them.  That is their right.

6.     But the Constitution does not permit the City to fire a public employee for making those statements on his own time, as a private citizen.

7.     There is no dispute that Mr. Gonzalez was fired solely and expressly for his private, off-duty political speech. The City Manager stated, in writing, the reason. And the people who engineered his firing, particularly Defendant City Council Member Jennifer McAdams, and one of her allies, a man named Randy Fairgarden, were proud of what they had done, and made no secret of the fact that

they wanted MR. GONZALEZ fired because they didn't like his political views. They destroyed his livelihood, not because of anything he ever did as a police officer, but purely because of his private off-duty expression of his political views. But in the United States, the Constitution prohibits public employers from firing employees for their private off-duty expression of political views.

8. By this lawsuit, MR. GONZALEZ seeks to vindicate his constitutional rights, and help ensure that the constitutional rights of all Americans in public employment—teachers, firefighters, clerks, social workers, and police officers—remain protected.

**JURISDICTION, VENUE AND PARTIES**

9. Jurisdiction exists in this Court under 28 U.S.C. § 1331, because the claims alleged herein arise under the Constitution and laws of the United States. This case arises under the First and Fourteenth Amendments to the United States Constitution, and Title 42 § 1983 of the United States Code.

10. Venue is proper in this Court because the transactions and occurrences giving rise to the claims for relief asserted herein occurred in this District.

11. Plaintiff MR. GONZALEZ was at all relevant times a police officer with the CITY OF PACIFIC GROVE, California, within this District.

12. Defendant CITY OF PACIFIC GROVE ("CITY," "PACIFIC GROVE,"

13. Defendant POLICE CHIEF CATHY MADALONE was at all relevant times the Chief of Police for the CITY OF PACIFIC GROVE.  She committed that acts at issue herein during the course and scope of her employment with the CITY.

14. Defendant CITY MANAGER BEN HARVEY was at all relevant times the City Manager of the CITY OF PACIFIC GROVE. He committed that acts at issue herein during the course and scope of his employment with the CITY

15. PACIFIC GROVE City Council Member Jennifer McAdams was at all relevant times a Councilmember for the CITY OF PACIFIC GROVE. She is

not named as an individual defendant in this Complaint, because the publicly-available evidence Plaintiffs have thus far reviewed does not yet establish that she directly urged CHIEF MADALONE to fire Plaintiff.  Discovery may reveal additional information presently unknown to Plaintiffs.  If Council Member McAdams did use her official office to attempt to procure Plaintiff's termination, then she is a proper section 1983 defendant, and Plaintiffs will amend their complaint to name her. She would not have absolute legislative immunity, if she used her official title, powers, and status to attempt to procure Plaintiff's termination, because attempting to procure the termination of a single employee is not within the legislative scope of her position as a City Council member.  *See*, *e.g.*, *Kaahumanu v. Cty. of Maui*, 315 F.3d 1215, 1220 (9th Cir. 2003).

16.     Randy Fairgarden is not named as an individual defendant in this Complaint, because the publicly-available evidence Plaintiffs have thus far reviewed does not yet establish that he acted as a joint state actor in his actions attempting to procure Plaintiff's termination. Discovery may reveal additional evidence presently unknown to Plaintiffs.  If Mr. Fairgarden did act as a joint state actor in attempting to procure Plaintiff's termination, then he is a proper section 1983 defendant, and Plaintiffs will amend their complaint to name him.

17.     PLAINTIFFS are ignorant of the true names and capacities of defendants sued herein as DOES 1-10, inclusive, and therefore sues said defendants by fictitious names.  PLAINTIFFS will amend this complaint to allege their true names and capacities when they are ascertained.

18.     PLAINTIFFS are informed and believe and therefore allege that each of the fictitiously named defendants was responsible in some manner for the occurrences herein alleged, including without limitation aiding and abetting the wrongful acts of Defendants as set forth herein, and that PLAINTIFFS' injuries as herein alleged were proximately caused by said Defendants.

19.    PLAINTIFFS are informed and believe and therefore allege that Defendants were the agents of their co-defendants and in doing the acts herein alleged were acting within the scope of such agency and with the participation, ratification, direction, and permission of their co-defendants.

**FACTS**

20.    This case began with a bumper sticker.  In the Spring of 2020, MR. GONZALEZ, a Republican, put a "Trump-Pence" bumper sticker on his personal vehicle, a pickup truck. His cousin gave him another bumper sticker as a gift.  It read: "Liberty Guns Beer Trump."  MR. GONZALEZ put it on his pickup as well, under the Trump-Pence sticker.  He drove his pickup back and forth to work each day, like every other CITY employee in Pacific Grove.

21.    MR. GONZALEZ's pickup also flew two small American flags, and was decorated with a "Thin Blue Line" bumper sticker.  And it had two small circular decals in the rear window.  One was a logo of the Marvel comic-book hero "The Punisher," and the other was a picture of a grizzly bear with the word "Three Percenters."  "The Punisher" is the crime-fighting lead character in a series of popular comic books, which were adapted to multiple movie and television productions, most recently a film version starring Thomas Jane and John Travolta. The "Three Percenters" slogan is a widely-used reference, likely apocryphal, to the percentage of colonial Americans who fought in the American Revolution.

22.    Pacific Grove has an elected CITY Council, and one of those CITY Council members, Jennifer McAdams, saw MR. GONZALEZ's personal vehicle parked in a CITY lot, and grew angry at seeing the stickers.

23.    Council Member McAdams immediately and deliberately began using her official powers and office to attempt to learn the identity of the person who had dared express contrary political views to hers.  The implication of her communications with CHIEF MADALONE was that whoever it was should be fired.

24.    This is a photo of MR. GONZALEZ's personal vehicle as it appeared in May 2020.

25.    On Saturday, May 23, 2020, Council Member McAdams emailed the CITY's Police Chief, Cathy Madalone.  Council Member McAdams demanded that Chief Madalone find out who the owner of the offending vehicle was, implying that the person should be punished or fired.

26.    Council Member McAdams then contacted a reporter named Mary Duan, of the Monterey County Weekly, and proposed that Ms. Duan write an article about the vehicle with the offending stickers.  Ms. Duan did so.  She filed a Public Records Act request with the CITY for all documents relating to the stickers and the CITY'S response to them.

27.    She then called Chief Madalone and asked about the stickers: whose car was it?  What was the Chief going to do about it?

28.    Council Member McAdams' actions were based expressly on the political viewpoint of his private speech as a citizen on matters of public concern.  Attempting to punish, terminate, or otherwise cause adverse employment effects to a public employee based solely on the political viewpoint of his private speech as a citizen on matters of public concern, is outside the scope of a legislator's legislative duties.

29.    Specifically, attempting to punish, terminate, or otherwise cause adverse employment effects to a public employee based solely on the political viewpoint of his private speech as a citizen on matters of public concern, is: (1) ad hoc decision-making rather than the formulation of policy; (2) directed solely at one individual rather than the public at large; (3) not formally legislative in character; and (4) lacking in the hallmarks of traditional legislation.  *See Kaahumanu v. Cty. of Maui*, 315 F.3d 1215, 1220 (9th Cir. 2003).

30.    Chief Madalone was new to the job and new to Pacific Grove—she had been hired from another city less than a year earlier—and she did not want to

antagonize Council Member McAdams.  She could have respectfully told Council Member McAdams that it was not appropriate for a Councilmember to demand that CITY employees be punished or fired for their political views.  She could have respectfully told Council Member McAdams and Ms. Duan that Americans, including employees of the CITY of Pacific Grove, have the right to put political bumper stickers on their cars.

31.     She didn't, though.  The very same day that Ms. Duan called—June 1, 2020—Chief Madalone summoned MR. GONZALEZ to a meeting with her and her second-in-command, Commander Rory Lakind.  Chief Madalone and Commander Lakind gave MR. GONZALEZ an ultimatum: "These are your two choices.  You go home and remove the stickers off your vehicle, or you move your vehicle off CITY property."  They demanded that MR. GONZALEZ remove all the bumper stickers from the pickup, including the "Trump-Pence" sticker and the "Thin Blue Line" sticker.

32.     MR. GONZALEZ told Commander Lakind that he was uncomfortable with Commander Lakind's command, because the pickup was his personal vehicle.  He stated that his political beliefs don't have any impact on his performance of his job, and that he believed he had a right to express his political views in his bumper stickers.

33.     Chief Madalone then told MR. GONZALEZ that "the matter is not up for discussion," and that she was immediately placing him on administrative leave. He asked her why, and she responded that there was "an article coming out," and that many people were upset about the killing of George Floyd by police officers in Minneapolis, Minnesota, which had occurred approximately two weeks prior.

34.     Chief Madalone placed MR. GONZALEZ on administrative leave, then issued three public statements condemning the political bumper stickers and stating that the Department was "investigating" potential connections to "white-supremacist" and "extremist" groups.  Those statements were false and misleading.

35.    MR. GONZALEZ is a third-generation Mexican-American.  He grew up in a poor neighborhood of Bakersfield.  He is not white.  He is not a white supremacist.  He is not a member of any "white supremacist" or "extremist" group.

36.    CHIEF MADALONE and the Department knew all this. There was nothing to "investigate."  Displaying political bumper stickers on one's personal vehicle is a core First Amendment right.  There was no possible legal basis for punishing or firing MR. GONZALEZ for the bumper stickers on his personal vehicle.

37.    Yet the Department chose not to defend its own officer when he was publicly and falsely accused—with no factual basis whatsoever—of being a "white supremacist" and "militia member."

38.    Instead, CHIEF MADALONE, not wanting to antagonize Council Member McAdams, hung MR. GONZALEZ out to dry.  Here's how Mr. Gonzales himself described his reaction to the news article, in the Department's internal investigation:

> When I read the article, it was kind of shell-shocking to me.  I
> immediately removed the stickers because, it's just very hurtful
> because I've worked so hard, it's very upsetting.  Because I'm a third-
> generation Hispanic male, like I said.  My grandfather came here to
> this country, fought [in the military], was subject to discrimination.
> My grandpa told me all the things that happened to him.  That he was
> kicked around, he was beaten in school, just because he didn't speak
> English, or because he was a dark-skinned Mexican.  And myself?  I
> grew up in a poor, driven community, in the City of Bakersfield.  I
> was pulled over more than I can probably count on my hand, for being
> this, you know, shaved head, tattooed Mexican kid.  I was the
> stereotype of 'that's a thug.'  But what these cops, they didn't know,
> is that my life-long dream was to always be a cop. And I didn't hate

them for what they did.  I made a personal choice to say, You know
what? This is another reason why I'm going to be a cop, [despite]
actions like this, discrimination just because somebody may look a
certain way…. My family didn't want me to be a cop.  But I set out to
do what I want to do because I believe I make a change.  It may be
half a percent out of the whole entire world, but I'm doing something,
and I know I am.  That's the reason I decided to be a cop…. Growing
up in a gang-driven [area], most of the people that I knew and grew up
with are in prison, or dead from getting shot, because of that lifestyle.
I chose a different route.

39.    The Department's internal investigation concluded that Council
Member McAdams' complaint was "not sustained."

40.    Council Member McAdams was not satisfied.  She wanted whoever
dared put those stickers on that vehicle to be identified, punished, and fired.  She
raised the issue repeatedly on social media and in City Council meetings.  She
falsely and without any evidence accused MR. GONZALEZ of being a racist, a
white supremacist, and a member of a violent, anti-government "militia."  In fact,
MR. GONZALEZ was and is none of those things.  Council Member McAdams
coordinated with a small group of individuals, including a gentleman named
Randy Fairgarden, who embarked on a campaign to get MR. GONZALEZ fired.

41.    Mr. Fairgarden was also proud of his efforts in this regard. He wrote
about them on social media, and then created a flier that he sent to police
departments around the state of California, warning them not to hire MR.
GONZALEZ.  Mr. Fairgarden falsely stated that MR. GONZALEZ was "a
member of a violent militia group who participated in the January 6 Capitol
Building riot in Washington, D.C."  Here is what he sent to numerous police
departments in California:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



42.     Mr. Fairgarden's statement is a lie. MR. GONZALEZ is not and never has been a member of any militia group, violent group, or extremist group. He has never been to Washington, D.C., he was in California on January 6, 2021. Mr. Fairgarden made the false and defamatory accusations against MR. GONZALEZ with the express goal of destroying MR. GONZALEZ's livelihood.

43.     In his flier, Mr. Fairgarden threatened any agency that might hire MR. GONZALEZ: "Do yourself a favor and do not hire him.  I will find out and I will make it a headache not worth your trouble."

44.     Mr. Fairgarden's actions are relevant to the instant Complaint because Mr. Fairgarden coordinated and strategized with Council Member McAdams and the other state actors who engineered MR. GONZALEZ's firing for his political expression.  Mr. Fairgarden's openly stated goals and intentions are strong evidence of theirs.  Mr. Fairgarden and Council Member McAdams wanted MR. GONZALEZ fired and his future livelihood destroyed simply because they did not like the contents of his personal, off-duty expressions of his political believes as a private citizen. If discovery reveals that Mr. Fairgarden, who coordinated extensively with Council Member McAdams, engaged in joint state action to an extent that renders him a proper section 1983 defendant, then MR. GONZALEZ will request leave to amend appropriately and name Mr. Fairgarden as a defendant on a joint state actor theory.

45.     After the Department's investigation concluded that MR. GONZALEZ's bumper stickers did not violate any policy or law, and determined that Council Member McAdams' complaint was "not sustained," CHIEF MADALONE issued an apologetic public statement.  She stated that "the incident created divisiveness in our community and reawakened a stigma of bias and stereotypes from over a decade ago." (CHIEF MADALONE did not say what she meant by "over a decade ago," but whatever it was, it had nothing to do with MR. GONZALEZ as noted above, MR. GONZALEZ had worked at the Department for only four years.)

46.     CHIEF MADALONE continued, "We have learned from this incident, and plan to move forward together and heal together as a community."

47.     CHIEF MADALONE did not specify what the Department had "learned."

48.   One lesson that it might have learned is that public employees—of all political persuasions, and in all types of professions—are at risk of being bullied by elected officials who are willing abuse their offices to punish opposing political speech. CHIEF MADALONE, however, did not identify this as a lesson that she or the Department had learned.

49.   CHIEF MADALONE and/or other CITY officials could have made a forthright defense of all citizens' constitutional rights to express their political views—including public employees acting and speaking as private citizens on matters of public concern.

50.   If CHIEF MADALONE and/or other CITY officials had done so, then Council Member McAdams and her supporters would have recognized that their efforts to have MR. GONZALEZ fired were inappropriate and potentially in violation of section 1983.

51.   But CHIEF MADALONE did not present a defense of all citizens' constitutional rights to speak as citizens on their own time on matters of public concern.

52.   Instead, Council Member McAdams, Mr. Fairgarden, and others working with them in a group that identified itself as "Pacific Grove City Watch" were emboldened in their efforts to have MR. GONZALEZ fired.

53.   On September 3, 2020, CITY MANAGER BEN HARVEY emailed all Pacific Grove staff to inform them that MR. GONZALEZ would be returning to work.  He attached CHIEF MADALONE's statement, quoted above.  Neither MR. HARVEY nor CHIEF MADALONE ever referred to MR. GONZALEZ's constitutional rights, or acknowledged that the CITY's investigation had concluded that MR. GONZALEZ was properly exercising his constitutional rights and had not violated any CITY policies.

54.     One hour after receiving MR. HARVEY's email, Council Member McAdams wrote to CHIEF MADALONE and all PACIFIC GROVE staff, as follows:

> As a member of the LGBTQ community, I remain offended by the police officers decals and will not forget what I felt (sad, scared, angry, disgust) when I saw the racist decals and underline LGBT message. I can assure you we have lost the public's trust, especially people of color. BLM allies, and our LGBTQ community,  L.(iberty) G. (uns) B. (eer) T. (rump) Seriously..........

55.     Council Member McAdams wanted MR. GONZALEZ fired because of his political beliefs. So she and Mr. Fairgarden worked together to digitally "stalk" MR. GONZALEZ on the internet, i.e., to attempt to identify any personal social media accounts or statements he might make while off duty, to see if they could find him making any social media statements they could use against him. Mr. Fairgarden and his associates, in coordination with Council Member McAdams, did so, ultimately identifying a "Parler" social media account that they believed was MR. GONZALEZ's.

56.     At 12:12 p.m. on November 28, 2020, Council Member McAdams emailed CHIEF MADALONE and told her that she had found a social media account on Parler, an internet discussion forum, that she believed was MR. GONZALEZ's.  The account name was MAGS3PER.  The account has no mention of MR. GONZALEZ's name, or his employment, or Pacific Grove, or anything else linking the account to Pacific Grove in any way.  There was nothing in the account other than a private citizen expressing his views on matters of public concern.

57.     Here is the email Council Member McAdams sent to CHIEF MADALONE:

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Officer Gonzalez

Jenny McAdams <jmcadams@cityofpacificgrove.org>
Sat 11/28/2020 12:12 PM
**To:** City Manager <citymanager@cityofpacificgrove.org>; Leticia Livian <llivian@cityofpacificgrove.org>;
**Cc:** Bill Peake <bpeake@cityofpacificgrove.org>; Cathy Madalone <cmadalone@cityofpacificgrove.org>; dave
<dave@laredolaw.net>; heidi <heidi@laredolaw.net>

Good Morning,

Hope you all had a wonderful Thanksgiving holiday. The below screen shots were sent to me by a
concerned resident taken from Officer Gonzalez's Parley account.

It has also been brought to my attention that as the decals have been removed, they have been
replaced with Trump decals and a Trump hairpiece has been added to the Punisher decal. Many see
this as antagonistic and question his apology.

**I have two questions:**

1. Are social media posts like the below acceptable from Ben, Sandra, the Mayor, or any other City
employee?

2. How is this content in line with the PGPD's Code of Ethics statement of: " I will keep my private life
unsullied as an example to all;"

*And*

"Honest in thought and deed in both my personal and official life, I will be exemplary in obeying the
laws of the land and the regulations of my department."

Thank you for your time and assistance. There is plenty of other inappropriate (and recent) content on
Officer Gonzalez's social media.



58.     Council Member McAdams told CHIEF MADALONE that the screenshots had been "sent to me by a concerned resident."  Council Member McAdams did not specify who this "concerned resident" was, or how this person "sent" her the screenshots.  In response to a Public Records Act request, the City turned over her emails, and those emails do not include any email from anyone sending her the screen shots she attached.  Discovery will reveal whether there is in fact any such "concerned resident," who else was involved, and what methods Council Member McAdams and/or her associates used to identify this Parler account, and.  It is unknown at this time whether those methods were legal or illegal, or involved the use of official government resources.  What is certain is that Council Member McAdams is the one who emailed CHIEF MADALONE.

59.     In her email, Council Member McAdams asked CHIEF MADALONE why the Parler posts did not constitute violations of multiple provisions of Department codes and policies.  The clear and obvious message of her email was: fire MR. GONZALEZ now.

60.     One of the posts was a re-posting of an image that read "Fuck 'Black Lives Matter'."  Another was a re-posting of an image that read "Free Kyle Rittenhouse."  Together, these will be referred to as the "Posts."  The Posts were posted on MR. GONZALEZ's private and personal social media account, with no mention of or reference to the CITY, his employment, or even his name.  They were posted on his own time while off-duty, and they were posted as a private citizen on matters of public concern.  The CITY's firing of MR. GONZALEZ was based expressly on the Posts.

61.     Council Member McAdams, after using unknown resources and methods to surveil MR. GONZALEZ's personal off-duty social media statements, then coordinated with Mr. Fairgarden to publicize those statements in the media, in order to create a basis for the argument that MR. GONZALEZ needed to be fired because of the "public outcry" over the Posts.

62.    The CITY indeed used that argument to justify its termination of MR. GONZALEZ.  CITY MANAGER HARVEY relied extensively on it in his September 24, 2021 written decision.  CITY MANAGER HARVEY neglected to mention, however, that it was Council Member McAdams who had surveilled MR. GONZALEZ's personal off-duty statements, that it was Council Member McAdams who first identified "Mike20091819" as MR. GONZALEZ, and that it was Council Member McAdams who publicized and circulated the Posts.

63.    In short, the CITY itself, through Council Member McAdams, digitally "stalked" one of its own employees as he engaged in political discussions on his own time, while off duty, on his personal social media; then publicized the Posts and worked to create a "public outcry"; then claimed that that "public outcry" justified firing MR. GONZALEZ.

64.    The period between June and November, 2020, was one of the most politically charged periods in American history.  Every major city in America saw large protests, led and organized by an activist group called "Black Lives Matter." The term denotes the political organizing group that led, promoted, publicized, and conducted these protests.  The group also urged, demonstrated for, and called on public officials to support, the "defund the police" agenda.  The rhetoric of "Black Lives Matter" was directed against police and police departments, which, Black Lives Matter contended, were racist, violent, and unreformable, and which should be eliminated.

65.    "Black Lives Matter" is a political organization.  It is not synonymous with "Black people."

66.    MR. GONZALEZ was opposed to the ideology, agenda, rhetoric, actions, and proposals of the Black Lives Matter political activist organization.  So were millions of other Americans.

67.    MR. GONZALEZ expressed that opposition on his own free time, as a private citizen.

68.     Many other Americans supported Black Lives Matter.

69.     The ideology, agenda, rhetoric, actions, and proposals of Black Lives Matter is a matter of public concern.

70.     An American citizen's choice to express his or her support for or opposition to Black Lives Matter is a fundamental Constitutional right protected by the First Amendment.

71.     The use of the word "Fuck" to express one's disapprobation for a policy, politician, group, a movement, or institution is fully protected by the Constitution.  As the Supreme Court has reminded us in multiple cases since for the past 50 years, an American citizen's right to express his or her views on matters of public concern by saying "Fuck" a particular policy, politician, group, movement, or institution, is a fundamental Constitutional right protected by the First Amendment. *See*, *e.g.*, *Cohen v. California*, 403 U.S. 15 (1971) ("Fuck the Draft"); *Mahanoy Area School Dist. v. Levy*, 141 S. Ct. 2038 (2021) ("Fuck cheer, fuck softball, fuck school").

72.     It is clearly established that a person's saying "Fuck 'Black Lives Matter'" in his personal capacity as a citizen, while off-duty, on his personal social media account, is a protected exercise of his First Amendment rights for which he cannot constitutionally by punished by his municipal employer.

73.     DEFENDANTS knew this, but used their official powers, status and color of law to obtain MR. GONZALEZ's termination for those posts anyway.

74.     The issues raised in Black Lives Matter protests during the summer of 2020 were issues of public concern.  They were widely debated and discussed throughout the country.  They were among the core issues animating the presidential election.  They were fundamental issues about the shape and direction of public policy in this country.  Every American had a fundamental constitutional right to talk about them.

75.    Like millions of Americans, MR. GONZALEZ was horrified, appalled, and outraged by the killing of George Floyd by a police officer.  As noted above, he himself had been a victim of discrimination and profiling in his youth, and he became a police officer specifically to make policing better and less discriminatory, to make a positive difference in the lives of people who were targeted for abuse by police because of their race, skin color, or social class.

76.    Like millions of Americans, MR. GONZALEZ was horrified, appalled, and outraged by the violence, looting, lawlessness, and anarchism displayed daily in the violent protests and riots around the country.  MR. GONZALEZ deeply disagreed with the Black Lives Matter agenda and the "defund the police" movement.

77.    By November 2020, MR. GONZALEZ knew, from his own experience, what it was like to be on the receiving end of self-styled "activists" and "social justice warriors" whose goal was to purge the Police Department of anyone who expressed a contrary political view.  He did not like the fact that Council Member McAdams and her supporters had tried to have him fired for his bumper stickers, and had publicly called him a "white supremacist."

78.    For MR. GONZALEZ, the political excesses of the Black Lives Matter movement were crystalized in his own experience with being the target of Council Member McAdams' outrage over his bumper stickers.

79.    MR. GONZALEZ had an account on Parler, a widely-used forum in which most participants held conservative views.  MR. GONZALEZ used Parler to read commentary posted by, inter alia, Senator Ted Cruz, Sean Hannity, Mark Levin, Tucker Carlson, Dinesh D'Sousa, Congressman Devin Nunes, and Phil Robertson.

80.    Like millions of other Americans, MR. GONZALEZ supported Donald Trump in the 2020 election, an election that was fraught with emotion on all sides.

81.     Millions of Americans uttered the phrase "Fuck ---" in reference to their political opponents in and around the 2020 election, and it was their constitutional right to do so.

82.     MR. GONZALEZ, speaking on Parler as a private citizen, off-duty, on his own time, on his own personal social media account, with no reference to or connection to the City or the Department or his profession, expressed his view on November 28, 2020 in the first of the Posts.  He posted: "Fuck 'Black Lives Matter'."

83.     He had a right to say that.

84.     It's the same right that a Pennsylvania high school student had to post on Instagram: "Fuck softball, fuck, cheer, fuck school, fuck everything."  It's the same right that Daniel Cohen had to wear a "Fuck the Draft" patch on his jacket.

85.     MR. GONZALEZ, speaking on Parler as a private citizen, off-duty, on his own time, on his own personal social media account, again expressed his view on November 28, 2020 in the second of the Posts.  He posted: "Free Kyle Rittenhouse."

86.     He had a right to say that.

87.     It violates clearly established law for any public employee to be fired for saying "Free Kyle Rittenhouse."

88.     Kyle Rittenhouse is an individual who shot three people, two of them fatally, during riots in Kenosha, Wisconsin in the summer of 2020.  He contended that the shootings were in self-defense, because he was attacked by those individuals while he was attempting to assist injured people as an informal volunteer medic.

89.     The Rittenhouse case was among the most widely-discussed cases in the United States.

90.     Millions of people believed that Mr. Rittenhouse should be convicted.

91.     Millions of people believe that Mr. Rittenhouse should be acquitted.

92.     Expressing an opinion on one side or the other of that issue is core political speech protected by the First Amendment under clearly established law.

93.     Mr. Rittenhouse went to trial and was acquitted by a jury of his peers.

94.     No reasonable public official could possibly believe that it was constitutionally permissible to fire a public employee for saying "Free Kyle Rittenhouse" as a private citizen, on his own time, while off duty, on his own personal social media account that made no reference to his employment or the City, and indeed did not even include his name.

95.     DEFENDANTS knew this, but nonetheless used their official office, powers, status and color of law to terminate MR. GONZALEZ based on his statements.

96.     It is unknown at this time what methods Council Member McAdams, Mr. Fairgarden, and "Pacific Grove City Watch" used to surveil MR. GONZALEZ online.  Discovery will reveal those methods and MR. GONZALEZ reserves the right to pursue appropriate remedies.  If state action was involved, MR. GONZALEZ reserves the right to amend as necessary.

97.     On November 28, 2020, Council Member McAdams emailed CHIEF MADALONE.  She stated that she had learned from an unnamed "concerned CITY resident" of MR. GONZALEZ's post. CHIEF MADALONE immediately placed MR. GONZALEZ on administrative leave and would investigate.

98.     The CITY conducted its investigation very quickly.  It concluded that by posting "Free Kyle Rittenhouse" and "Fuck Black Lives Matter" on November 28, 2020, MR. GONZALEZ had violated a Department code of conduct requiring him to "keep [his] private life unsullied," to refrain from "disgraceful conduct," and to refrain from "speech or expression that could reasonably be foreseen as having a negative impact on the credibility of the employee as a witness."  The City expressly cited and relied upon both Posts.

99.    CHIEF MADALONE terminated MR. GONZALEZ on or about January 13, 2021.

100.    An evidentiary hearing was held before the CITY MANAGER HARVEY on February 11, 2021, at which MR. GONZALEZ contested his termination.  The hearing revealed that there was no evidence whatsoever that MR. GONZALEZ'S private, off-duty social media comment had had any impact on the operations of the Department.

101.    At the hearing, CHIEF MADALONE admitted that she had no basis for believing that MR. GONZALEZ was biased or had engaged in any disrespectful or improper conduct as a police officer.  On the contrary, she admitted that in all respects, his performance as a police officer was positive.

102.    The CITY admitted that Black Lives Matter is a political and social movement.

103.    It was and remains undisputed that the express and sole reason the CITY fired MR. GONZALEZ was the content of his personal off-duty speech as a citizen on matters of public concern.

104.    On or about September 24, 2021, CITY MANAGER HARVEY issue his final decision affirming MR. GONZALEZ's termination.  HARVEY stated expressly in his order that the conduct for which MR. GONZALEZ was being fired was posting "Free Kyle Rittenhouse" and "Fuck Black Lives Matter" on his personal social media account.

105.    There was no evidence whatsoever that the Posts ever caused any disruption of police functions or services.

106.    The Posts, indeed, could not themselves have caused any disruption of police functions or services, because nothing in them referred to Mr. Gonzalez's name, his profession, his employer, or his state of residence.

107.    Rather, the February 2021 evidentiary hearing revealed instead that the Department's only claims of "disruption" were based on Council Member

McAdams and her associates publicizing the Posts, and encouraging a small number of citizens (approximately four or five, including Mr. Fairgarden), who explicitly wanted MR. GONZALEZ fired because of his personal political views, and who had wanted him fired back in May, for his Trump stickers.

108.    CHIEF MADALONE speculated that because the public was now aware (thanks to Council Member McAdams' and her associates' efforts to publicize the Posts) that MR. GONZALEZ had posted "Fuck 'Black Lives Matter'" on his personal social media account, in future interactions he might have with "a person of color, there's a likelihood that the CITY will get a claim; and interactions that he has with the public, whether people of color or not, once they realize that, oh, that's the guy that posted 'Fuck Black Lives Matter,' yep, I'm going to make a complaint about this guy."

109.    As a matter of clearly established law, speculation about people's potential reactions to a public employee's personal, off-duty speech on matters of public concern cannot be a basis for adverse employment action.

110.    As a matter of clearly established law, it is illegal under the First Amendment and Section 1983 for state officials to fire a public employee because some members of the public do not like the employee's off-duty expression of his personal political views.

111.    There was no actual disruption of any police operations, services, or functions as a result of the Posts.

112.    The CITY's predictions of "future disruptions" were sheer speculation: speculation, as quoted above, that "the CITY will get a claim" whenever MR. GONZALEZ had an interaction with "a person of color."

113.    The CITY presented no evidence whatsoever in support of that speculation.

114.    Four or five individuals being upset at the off-duty political speech of an officer is not a "substantial interference with department operations."

115.   Speculation that members of the public might make complaints about their interactions with MR. GONZALEZ if they "realized that he's the guy that posted 'Fuck Black Lives Matter," is not a "substantial interference with department operations."

116.   It is undisputed—and the Department explicitly stated—that it terminated MR. GONZALEZ because of his off-duty political speech as a citizen on a matter of public concern.

117.   The complaints articulated by Council Member McAdams and unnamed members of the public were specifically directed to the political content and viewpoint of MR. GONZALEZ's personal, off-duty statements.  Those statements concerned matters of widespread public discussion—the Presidential election, and the direction of future policy regarding policing—which continue to be widely discussed in public discourse.  The Constitution guarantees MR. GONZALEZ the right to speak about that issue as a private citizen, free of restraint, discipline, or retaliation by his public employer.  It has long been clearly established law that the expression of political viewpoints on matters of public concern enjoys the highest level of protection of any speech under our Constitution, and that viewpoint discrimination by public entities is virtually never justifiable.

118.   Council Member McAdams and Mr. Fairgarden sought to purge the employee rolls of Pacific Grove of all employees who hold personal political views they disapprove of.  But that is not permitted by our Constitution.

119.   CHIEF MADALONE, knowing that the explicit and sole basis for the complaint against MR. GONZALEZ was his personal, off-duty speech as a citizen on matters of public concern, fired him anyway.  She violated clearly established law, of which she was on actual and constructive notice.

120.   Despite knowing that clearly established law prohibited firing a public employee based on the content of his off-duty personal speech as a citizen on

matters of public concern, DEFENDANTS decided, intended to, and did, punish, discipline, terminate and otherwise impose adverse employment actions on MR. GONZALEZ because of his off-duty speech as a private citizen on his personal social media account. DEFENDANTS knew that the Constitution provides everyone, even public employees, the right to freedom of speech and thought in their personal off-duty social media speech as a citizen on matters of public concern.  But DEFENDANTS did not like the political viewpoint of MR. GONZALEZ's speech, and decided to punish him for it using their official positions, authority, and color of state law.

121.   MR. GONZALEZ defended himself, asserting his constitutional right to speak while off-duty as a private citizen on matters of public concern on his private social media account.

122.   The investigation found, and the CITY expressly agreed, that MR. GONZALEZ made the Posts while off-duty, on his own personal time, and never identified himself as, or claimed to speak on behalf of, any police department or government agency.

123.   The investigation found, and the CITY expressly agreed, that MR. GONZALEZ was terminated based on the content of the Posts.

124.   It is undisputed that the Posts address a matter of public concern—indeed, the issue was arguably the nation's most significant matter of public concern during the middle of 2020.

125.   MR. GONZALEZ was harmed, continues to be harmed, and will be harmed in the future by the DEFENDANTS' wrongful actions.

126.   MR. GONZALEZ was harmed economically, psychologically, reputationally, and emotionally by being targeted by DEFENDANTS and terminated from his employment for expressing his views on matters of public concern in his speech as a private citizen on his personal social media accounts.

127.   MR. GONZALEZ could and would have continued to work as a Pacific Grove police officer for the next 25 years, but for DEFENDANTS' wrongful actions as set forth herein.  Now, he likely will never be able to work as a police officer again, despite the accolades he earned for the performance of his duties, and the complete absence of any suggestion of any improper conduct on the job.  His economic damages include, inter alia, the lost value of the salary he would have earned during that time, plus the pension he would have earned for the rest of his life upon retirement, as compared to the much lower earnings he will be able to obtain in the private sector.

128.   Every PACIFIC GROVE employee continues to experience the chilling effect of being fired for his or her personal off-duty political speech. DEFENDANTS' actions were a slap in the face of the Constitution and every public employee in the City, of all political persuasions, but it is MR. GONZALEZ who felt that slap most acutely.

129.   DEFENDANTS' wrongful actions destroyed MR. GONZALEZ's career. DEFENDANTS' wrongful actions harmed him economically in an amount subject to proof at trial, including at least the following: loss of his salary and benefits for the approximately 25 years he would otherwise have continued to work as a police officer; loss of the pension he would have received for the rest of his life after retiring; loss of the potential private-sector opportunities in, e.g., consulting or security that are available to retired officers.  The amount of this economic harm is subject to proof at trial.

130.   All CITY personnel—from teachers to firefighters to clerks to social workers—continue to be harmed by the CITY's blatant and overt policy of targeting, punishing, and firing employees based on their personal off-duty political speech.  Every employee of Pacific Grove needs to wonder whether he or she might be next, if something he or she says off-duty in his or her capacity as a private citizen participating in debate about matters of public concern happens to

provoke the ire of Council Member McAdams, Randy Fairgarden, or other "social justice champions" who believe that public employees whose political views they dislike should be fired.

131. The knowledge that the CITY will openly engage in the unconstitutional practice of firing employees based on their off-duty speech on matters of public concern chills the exercise of the constitutional rights of speech and political participation of all CITY personnel. That chilling effect is a past, present, and future ongoing harm to everyone who works for the CITY. The right to participate freely in public discussion of matters of public concern is of immense importance in a democracy, but the CITY has sent the message loudly and clearly to all its employees that it does not respect that right.

132. DEFENDANTS and each of them participated in and ratified the termination proceedings against MR. GONZALEZ.

133. The personal participation by DEFENDANTS in the CITY's conduct as set forth herein—deliberately targeting officers for discipline, punishment and termination based on the political viewpoint of their off-duty speech on matters of public concern—is oppressive conduct, because it was done in a manner which injures or damages or otherwise violates the rights of another person with unnecessary harshness or severity and by misuse or abuse of authority. It is therefore sufficient to support an award of punitive damages in this action. *Dang v. Cross*, 422 F.3d 800, 809 (9th Cir. 2005).

134. The CITY is sending a loud and clear signal to its employees. It may as well post signs that read: "You'd better not engage in social media debates on anything, even important matters of public policy and national concern, because if Councilmember McAdams or her allies don't like what you say, we'll fire you." Such a policy on public-employee speech is not permissible in the United States.

135. A municipal employer may not covertly surveil the personal, anonymous, off-duty political speech of its employees, then publicize the speech,

"out" its employee as the speaker, manufacture "public outrage," and then fire the employee based on the purported "public outrage"—all without ever once so much as suggesting that the employee had ever done anything remotely improper in the performance of his job.

136.   The Constitutional principle that public employees may not be fired for the content of their off-duty speech as citizens on matters of public concern is a principle that protects *all* Americans, and *every* public employee, regardless of their political ideology.  This case is about that principle.  All Americans and all municipalities should respect it.

## CLAIM FOR RELIEF

### First Claim For Relief

### Retaliation Based on Exercise of Right to Free Speech in Violation of 42 U.S.C. § 1983

### (MR. GONZALEZ Against All DEFENDANTS)

137.   MR. GONZALEZ re-alleges and incorporates by reference as if fully set forth herein all preceding paragraphs of this Complaint.

138.   MR. GONZALEZ engaged in constitutionally protected activity when he spoke as a private citizen on matters of public concern, on his personal social media account, in making the Post.

139.   As a result of his constitutionally protected activity, MR. GONZALEZ was subjected to adverse action by DEFENDANTS under color of state law that would chill a person of ordinary firmness from continuing to engage in that protected activity, when DEFENDANTS charged him with misconduct and fired him.

140.   There was a substantial causal relationship between the constitutionally protected activity and the adverse action taken against MR. GONZALEZ by DEFENDANTS, because DEFENDANTS directly and expressly punished him for his constitutionally protected activity by firing him.

141.     DEFENDANTS developed and maintained policies and customs that violated MR. GONZALEZ's constitutional rights.  DEFENDANTS ratified, endorsed, and abetted the retaliatory decisions and actions, and the basis for them. DEFENDANTS knew of, ratified, and failed to stop, the imposition of discipline against MR. GONZALEZ for exercising his First Amendment rights.

142.     As a direct result of MR. GONZALEZ's exercising his constitutional right to speak publicly—on his own time, off-duty, as a citizen—publicly on matters of public concern, DEFENDANTS retaliated against him, including, inter alia, taking adverse employment actions against him, by disciplining him for the content and/or viewpoint of his speech. Absent MR. GONZALEZ's exercising his constitutionally protected rights to speak, DEFENDANTS would not have taken the adverse employment actions against him set forth herein.

143.     At all times mentioned herein, MR. GONZALEZ's constitutionally protected activities were related to matters of public concern, and were not undertaken pursuant to job duties. MR. GONZALEZ's speech was on matters of widely-debated public concern.

144.     By taking adverse employment actions against MR. GONZALEZ that were substantially motivated by his constitutionally protected speech, DEFENDANTS violated MR. GONZALEZ's rights under the First Amendment to the United State Constitution.

145.     DEFENDANTS' official custom, pattern and practice of retaliating against police officers for the content and viewpoint of their off-duty, private-citizen speech on matters of public concern, has a continued chilling effect upon MR. GONZALEZ's speech activities and those of many of his fellow officers. DEFENDANTS' adverse employment actions were intended to, did, and would reasonably chill and deter MR. GONZALEZ, other officers, and other CITY employees from speaking publicly, on their own time, on matters of public

concern, out of fear that if they expressed certain political views or opinions as citizens, they may be punished as CITY employees.

146.    As a direct result of DEFENDANTS' acts and omissions, MR. GONZALEZ has suffered significant damages in an amount subject to proof at trial, including psychological and emotional harms; reputational harms; lost promotional opportunities and associated lost wages and pension income; and lost future income from post-retirement private-sector employment opportunities that will be unavailable to him because he now has an adverse disciplinary record with the Department.

147.    As a direct, foreseeable, and proximate result of DEFENDANTS' wrongful acts and omissions, MR. GONZALEZ suffered and continues to suffer mental and emotional distress, humiliation, anxiety, embarrassment, and discomfort, to his detriment, in an amount according to proof at the time of trial, and expenses incurred for treatment of same.

148.    In performing the acts herein alleged, DEFENDANTS acted intentionally to injure MR. GONZALEZ, namely, to terminate his employment, because of the content and viewpoint of his constitutionally protected speech on matters of public concern, which he engaged in while off duty, as a citizen.

149.    DEFENDANTS' actions were unconstitutional and DEFENDANTS knew it and should have known it.

150.    DEFENDANTS' conduct was oppressive, despicable and performed with a willful, conscious, and reckless disregard of MR. GONZALEZ's civil rights such that punitive or exemplary damages are warranted.

## PRAYER FOR RELIEF

WHEREFORE, PLAINTIFFS pray for Judgment against DEFENDANTS for:

1. Compensatory damages, economic and non-economic damages in excess of $1,000,000, in an amount according to proof;

2. General damages to compensate MR. GONZALEZ for mental and emotional injuries, distress, anxiety, and humiliation;

3. Attorneys' fees pursuant to 42 U.S.C. § 1988;

4. Exemplary or punitive damages as to individual DEFENDANTS in an amount according to proof that is sufficient to punish and prevent future violations of constitutional rights (namely, the deliberate retaliation against, punishment of, or constructive termination of, a public employee based on the employee's protected First Amendment speech as a private citizen on matters of public concern);

6. Costs of suit;

7. Post-judgment interest;

8. Such additional relief as the Court may deem proper.

DATED:  Feb. 22, 2022                          Respectfully submitted,

CALEB E. MASON
Werksman, Jackson & Quinn, LLP
Attorney for Plaintiff

**<u>DEMAND FOR JURY TRIAL</u>**

MR. GONZALEZ demands a jury trial.

DATED:  Feb. 22, 2022                     Respectfully submitted,

CALEB E. MASON
Werksman, Jackson & Quinn, LLP
Attorney for Plaintiffs